

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INTERNATIONAL DRIVER TRAINING, INC. | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. |
| v. | § § | 3-05 CV-2194 K |
| J-BJRD, INC. and BILL CLINTON DODGIN, | § § § | |
| Defendants. | § § § | A JURY IS DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff International Driver Training, Inc. files this its Original Complaint against Defendant J-BJRD, Inc. and Bill Clinton Dodgin, respectfully showing as follows:

### I.

### PARTIES

1.      Plaintiff International Driver Training, Inc. ("IDT" or "Franchisor") is a corporation organized and existing under the laws of the State of Texas, having its principal place of business at 7531 Summitview, Irving, Texas 75063.

2.      Defendant J-BJRD, Inc. ("J-BJRD" or "Franchisee") is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 6003 Devon, Amarillo, Texas 79109.  Defendant J-BJRD may be served with summons and a copy of this complaint by serving its registered agent for service of process: Bill C. Dodgin at 6003 Devon, Amarillo, TX 79109.

3.      Defendant Bill Clinton Dodgin ("Dodgin") is an individual residing in the State of Texas and he may be served with summons and a copy of this complaint at 6003 Devon, Amarillo, TX 79109.

1

**II.**

**JURISDICTION AND VENUE**

4.      This is an action for (i) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.* ("Lanham Act"); (ii) common law trademark infringement, and (iii) breach of contract.

5.      This Court has jurisdiction of this action pursuant to the Lanham Act, 15 U.S.C. § 1121(a), and 28 U.S.C. §§ 1331 and 1338(a).  This Court has supplemental jurisdiction over IDT's state, common law, and breach of contract claims pursuant to 28 U.S.C. § 1367 (a).

6.      Venue is proper in this district pursuant to agreement between IDT and J-BJRD. Venue also is proper under 28 U.S.C. §§ 1391(b)(2) and (c) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district and Defendant J-BJRD resides in this district.

**III.**

**BACKGROUND FACTS**

7.      IDT operates defensive driving schools with classes taught by professional stand-up comedians.    IDT  does  business  under  the  name  "COMEDY  DEFENSIVE  DRIVING SCHOOL®" and has publicized the name ""COMEDY DEFENSIVE DRIVING SCHOOL®" to the public.

8.      The trademark "COMEDY DEFENSIVE DRIVING SCHOOL®" is a federally registered trademark (the "Mark") that was registered on October 12, 1993.  IDT is the assignee of  the  trademark  "COMEDY  DEFENSIVE  DRIVING  SCHOOL®"  and  has  the  right  and authority to license the use of the name "COMEDY DEFENSIVE DRIVING SCHOOL®" to others.

9.    Defendant Dodgin is an individual who desired to operate a "COMEDY DEFENSIVE DRIVING SCHOOL®" in Amarillo, Texas. Defendant Dodgin, doing business in the corporate form of J-BJRD, entered into an agreement (the "Agreement") whereby Dodgin and J-BJRD were authorized to operate a "COMEDY DEFENSIVE DRIVING SCHOOL®" and to use the "COMEDY DEFENSIVE DRIVING SCHOOL®" registered trademark. A form of the Agreement entered into is attached hereto as exhibit "1." On June 6, 2002, IDT and J-BJRD entered into a Franchise Agreement Amendment that modified the Agreement. A copy of the agreement amendment is attached hereto as exhibit "2."

10.    The Agreement sets forth the terms and conditions of the business relationship between IDT and J-BJRD. Specifically, the Agreement states that it "shall have an initial term of TEN (10) YEARS commencing on the date of its execution," (Art. III. A.), with an option to renew for additional ten year term that could be exercised by Franchisee giving "written notice of Franchisee's election to renew not less than SIX (6) MONTHS nor more that TWELVE (12) MONTHS prior to the expiration of the initial term." (Art. III. B. 1.). The Agreement is dated September 27, 1995.

11.    J-BJRD did not renew the Agreement and the Agreement has expired.

12.    The Agreement provides that "Franchisee's right to conduct business and operate Centers ceases immediately upon the expiration date of this Agreement...." (Art. XIII. A.). The Agreement provides further that upon expiration: (1) "Franchisee agrees to transfer all telephone numbers and related directory listings to Franchisor or Franchisor's designee;" (2) "Franchisee agrees to provide to Franchisor a copy of all records relating to the Franchisee's business;" (3) Franchisee agrees to return to Franchisor all manuals and other materials;" and (4) Franchisee agrees not to publicize or promote itself as a former franchisee of the Franchisor." (Art. XIII. B.).

13.     The Agreement provides further that "[a]ny provision of this Agreement which imposes an obligation after termination or expiration of this Agreement will survive the termination or expiration of this Agreement." (Art. XIII. C.).

14.     The Agreement provides further that upon expiration "Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods procedures, and techniques associated with the franchise business and all Marks and distinctive forms, slogans, signs, symbols, and devices associated with and owned by the Franchisor. In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, and any other articles which display the Marks." (Art. XIII. D.). The Agreement further specifically provides that "Franchisee agrees to cease use of the Marks immediately upon the termination or expiration of this Agreement." (Article VII. D. 1).

15.     Defendants have notified IDT that Defendants intend to continue operating as "COMEDY DEFENSIVE DRIVING SCHOOL®" without paying royalties and without authorization from IDT. Further, following expiration of the Agreement, J-BJRD: (1) failed to transfer all telephone numbers and related directory listings to Franchisor or Franchisor's designee; (2) failed to provide to Franchisor a copy of all records relating to the Franchisee's business; and (3) failed to return to Franchisor all manuals and other materials.

16.     Further, following expiration of the Agreement, J-BJRD failed to immediately and permanently cease to use, in any manner whatsoever, any confidential methods procedures, and techniques associated with the franchise business and all Marks and distinctive forms, slogans, signs, symbols, and devices associated with and owned by the Franchisor, and all signs, advertising materials, displays, stationery, forms, and any other articles which display the Marks. Specifically, and without limitation, Defendants have failed to cease use of the Mark immediately upon the expiration of the Agreement.

4

## IV.

## CLAIMS FOR RELIEF

### A.   Claim One - Federal Trademark Infringement

17.   Paragraphs 1 through 16, above, are incorporated by reference and realleged.

18.   IDT is the owner through assignment of United States Registration Nos. 1,798,916 and 1,798,917 registered on October 12, 1993, for the service mark "COMEDY DEFENSIVE DRIVING SCHOOL" under which Defendants are operating their defensive driving school. IDT has devoted substantial effort to advertising and promoting its services and has developed considerable recognition under the distinctive service mark. Defendants are using IDT's Service Mark without IDT's consent in connection with the sale of services that causes confusion or mistake as to the origin, sponsorship or approval of those services.

19.   The foregoing acts of Defendants constitute infringement of IDT's United States trademark registrations under 15 U.S.C. § 1114. IDT has been directly damaged by Defendants' infringement of the service mark. In accordance with 15 U.S.C. § 1117(a), IDT seeks the recovery of Defendants' profits, IDT's damages, and costs of this action.

### B.   Claim Two - Common Law Trademark Infringement

20.   Paragraphs 1 through 19, above, are incorporated by reference and realleged.

21.   As stated in the preceding section, Defendants have used IDT's trademarks without IDT's consent, in the sale of services, creating confusion and mistake as to the origin, sponsorship, or approval of those services. These acts also constitute infringement of IDT's common law trademark rights.

### C.   Claim Three - Breach of Contract

22.   Paragraphs 1 through 21, above, are incorporated by reference and realleged.

23. The actions and omissions of Defendant J-BJRD constitute a breach of the Agreement. Without authorization, Defendant J-BJRD is continuing to operate using the name "COMEDY DEFENSIVE DRIVING SCHOOL®". Further, Defendant J-BJRD has failed to comply with its post-expiration obligations under the Agreement. As a result of the foregoing actions, IDT has suffered and will continue to suffer damages in an amount exceeding the minimum jurisdictional limits of this Court.

24. Pursuant to the terms of the Agreement, the Franchisee agreed to pay the Franchisor for any reasonable attorney fees, court costs and expenses of litigation Franchisor incurs related to its successful enforcement of the Agreement  Further, because of Defendant J-BJRD's breach, IDT is entitled to collect reasonable attorneys' fees, both at the trial court level and on any appeal pursuant to § 38.001 et seq. of the Texas Civil Practice and Remedies Code.

**D.    Claim Four - Attorneys' Fees and Costs**

25. Paragraphs 1 through 24, above, are incorporated by reference and realleged.

26. Because of Defendants' actions, IDT has found it necessary to employ the undersigned counsel to present this action. IDT is entitled to recover from Defendants its reasonable attorneys' fees incurred in this action pursuant to 15 U.S.C. § 1117(a). IDT also seeks recovery of prejudgment and post-judgment interest on its damages at the maximum lawful rate. IDT further seeks recovery of its costs of court.

**V.**

**REQUEST FOR PERMANENT INJUNCTIVE RELIEF**

27. Paragraphs 1 through 26, above, are incorporated by reference and realleged.

28. On information and belief, Defendants are causing irreparable damage to Plaintiff IDT by their acts of trademark infringement as described above and will continue said acts of infringement unless permanently enjoined by this Court.

## VI.

## <u>JURY DEMAND</u>

29.     Plaintiff IDT, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demands a trial by jury on all issues triable by right by a jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiff IDT prays that upon final hearing, it recover judgment against Defendants for the relief stated above, a permanent injunction, prejudgment interest and post-judgment interest at the highest lawful rates, its reasonable attorneys' fees, as allowed by law, all costs of suit incurred herein, and such other and further relief, either general or special, at law or in equity, to which Plaintiff IDT may be justly entitled.

Respectfully submitted,

Robert G. Oake, Jr.
Texas State Bar No. 15154800
Oake Law Office
1333 W. McDermott, Suite 200
Allen, Texas 75013
469.519.2755
469.519.2756 (fax)

Attorney for Plaintiff IDT

# EXHIBIT 1

EXHIBIT B

# RTKB, INC.

### FRANCHISE AGREEMENT

### DEDICATED GEOGRAPHIC AREA

THIS FRANCHISE AGREEMENT ("Agreement") is entered into by and between **RTKB, Inc.**, a Texas Corporation ("**Franchisor**"), and _____ ("**Franchisee**"), on this _____ day of _____, 199\_\_\_.

**WHEREAS**, through the expenditure of money, time, skill and talent, Franchisor has developed a strategic business approach, method and system with a distinctive format and decor ("**System**") to the commencement, marketing and operation of the business of remedial driver training classes and driver training; and

**WHEREAS**, Franchisor will continue to develop, refine and adapt its proprietary information, trade secrets and business know-how to improve the System for the presentation of the driver training and teaching procedures for utilization at locations where classes are held ("**Centers**"); and

**WHEREAS**, Franchisee desires to utilize Franchisor's System and Franchisor's trademarks, service marks, logos and other proprietary identification ("**Marks**") to conduct business in driving training and teaching procedures, and to utilize Franchisor's System in the operation of Centers.

**NOW, THEREFORE**, in consideration of mutual undertakings and obligations hereinafter set forth, Franchisor and Franchisee agree as follows, to-wit:

### ARTICLE I.

### GRANT

A.   Franchisee hereby accepts and Franchisor hereby grants to Franchisee the non-exclusive right to utilize Franchisor's System and the Marks that Franchisor may make available to Franchisee from time to time, in the operation of the Centers by Franchisee in accordance with the terms and conditions set out in this Agreement, and only within the geographical boundaries ("**Territory**") set out in Article I.D.

B.   The grant of right set out in Article I.A. above encompasses both the operation of temporary Centers and permanent Centers as hereinafter defined:

**"Temporary Center"** is a location which the Franchisee rents on a periodic basis for the Franchisee's use for the franchise business and conducting driver training classes. Usually such premises will be a conference room in a Hotel or Motel, Comedy Club or other suitable location.

**"Permanent Center"** is a permanent location where the Franchisee owns or has a lease on the premises for the Franchisee's exclusive use of the premises for the franchise business, and conducting driver training classes.

C. So long as Franchisee is in full compliance with the Franchisee's obligations under this Agreement including the Development Schedule (defined in Article I.D. hereunder) of Centers, if any, set out in Attachment A of this Agreement, Franchisee may operate Centers utilizing the System and Marks in the Territory set out under Article I.D. and Franchisor will refrain from operating Centers or granting rights to others to operate Centers in the Territory set out under Article I.D. unless Franchisee becomes in default of Franchisee's obligations for development of Centers set out under Attachment A, then the rights of Franchisee as set out under Article I.E. will be applicable. Franchisee understands and agrees that Franchisee will be operating in a media market where signals from broadcast and newspaper circulation cross into and out of the Terriroey since it is part of a defined marketing area (DMA) which will be part of an advertising cooperative system which the Franchisee is obligated to join and participate in in accordance with the provisions of Article X of this Agreement. The Dedicated Geographical Area (DGA) which is the Territory set out in Article I.D., is for purposes of locating Centers for Franchisee's operation of the Centers. The establishment of Franchisee's additional Centers shall be in accordance with this Agreement and the terms and conditions of this Agreement shall automatically extend to and govern the respective rights, duties and obligations of Franchisor and Franchisee as to each Center, including but not limited to payment to the Franchisor for each Center the additional initial franchisee fee set out under Article II, Paragraph A, and the royalty fees set out under Article II, Paragraph B. It shall not be construed or interpreted as conducting business or operating Centers in the Territory by Franchisor or other franchisees if advertising, publicity or promotional materials are broadcast, distributed or advertised in the Territory.

D. The following geographical boundaries shall constitute the Territory for this Agreement: _____

_____

_____

_____ .

_____

-2-

In the event any boundary designation or descriptions are changed by any government agency, natural condition or otherwise, a redefinition of Franchisee's boundaries will be determined by the Franchisor in its sole and absolute discretion. Franchisee will conduct the Franchise Business only in Centers in the Territory and Franchisee understands and agrees that Centers may not be established at a site located within one (1) mile of an existing Center whether the existing Center is located within or without the Territory and whether owned by Franchisee, the Company or another franchisee of the Company, without Franchisor's prior written consent. Franchisor may authorize Franchisee or any franchisee or the company to locate a Center within one (1) mile of an existing Center in the Franchisor's sole and absolute discretion except that so long as Franchisee is in compliance with Franchisee's development schedule such Centers may not be located in the Territory unless belonging to Franchisee.

E.  In the event Franchisee fails to adhere to and meet the time obligations for opening Centers set out in Attachment A (**"Development Schedule"**), then and in that event Franchisee understands and agrees the Territorial grant set out in this Article I.A.B. and C. above becomes automatically extinguished with no further action or notice required on the part of Franchisor and the franchise granted herein becomes a grant of a limited license to conduct business in and operate only the Permanent Centers which the Franchisee had opened at the time of Franchisee's default under the Development Schedule. In the event the Franchisee does not have a Permanent Center in operation at the time of its default under this Agreement to fulfill the Development Schedule, then, and in that event, Franchisee will be required to close its Temporary Centers within sixty (60) days and this Agreement will be terminated. The default of Franchisee of the Development Schedule shall not relieve Franchisee of its obligations to conduct franchise business through operation of Permanent Centers in accordance with this Agreement. Franchisor, upon such default, may immediately commence operating Centers in the Territory (as defined in Article I.D. above) or franchise, license or authorize others to operate Centers in the Territory upon such terms and conditions as Franchisor determines.

F.  Franchisee acknowledges that Franchisor has foregone the opportunity to operate Centers in the Territory and/or the location in which the Franchisee's Center is operated and the Franchisee agrees it will not close a Permanent Center without the consent of the Franchisor. The Franchisor will consider such factors as the sales volumes, competitive activity, whether the Franchisee is proposing to open a Permanent Center at a new location, the convenience to the location of the customers of Franchisee, and other pertinent business and competitive factors appropriate to the decision of closing a Permanent Center.

-3-

G.   Franchisee acknowledges that Franchisor is the owner of all right, title and interest in the System, the Marks, and in the design, decor and image of all Centers. Franchisee hereby expressly disclaims any right, title or interest therein or in any good will derived therefrom.

H.   If it becomes advisable at any time in Franchisor's sole discretion for Franchisor and/or Franchisee to modify or discontinue use of the Marks, and/or to use one or more additional or substitute trade or service marks, Franchisee agrees to comply therewith within a reasonable time after Franchisor gives written notice to Franchisee.

I.   Franchisor, in its sole discretion will have the unrestricted right to grant to others the right to operate a Center or operate a Center for its own benefit, utilizing the System, and Marks of Franchisor, as Franchisor may from time to time determine; provided, however, that Franchisor may not grant others or operate for its own benefit a Center in the Territory set out in Article I.D. above except as expressly provided in Article I.E. in this Agreement.

## II.

## **FEES AND ROYALTY**

A.   Franchisee will pay to Franchisor upon the execution of this Agreement an initial franchisee fee of _____ ($_____), which is a nonrefundable, fully earned franchisee fee, in consideration of the ongoing marketing, technical, administrative and other expenses incurred by Franchisor as well as the lost opportunity to Franchisor to franchise others or operate in the Territory during the time Franchisee has the exclusive right to the Territory set out under Article I. in this Agreement. Additionally, Franchisee will pay to Franchisor franchise fees set out hereunder at the business commencement date of additional Centers, which fee is a nonrefundable, fully earned franchise fee when paid to Franchisor:

1.   Centers two through four: Seventy-five percent (75%) of initial franchise fee.

2.   Centers five and all subsequent Centers:   Fifty percent (50%) of initial franchise fee.

3.   The franchise fees for the additional Centers shall apply upon either Permanent Centers and Temporary Centers except that where a Temporary Center is opened and the franchise fee hereunder is paid as required, the replacement of the Temporary Center by a Permanent Center will not require any additional franchise fee. Further, since a Temporary Center may change its location for the conduct of the driver training classes without being a new Center, no additional franchise fee is required. A Temporary Center may not, however, conduct more than four (4) complete classes in a calendar week.

B.   During the term of this Agreement, Franchisee will pay Franchisor, a nonrefundable weekly royalty fee of **EIGHT PERCENT (8%)** of the Franchisee's weekly Gross Sales (as hereinafter defined) from the operations at, from or in conjunction with the utilization, either singularly or in combination, of the System, Marks, Territory, Centers, or other rights granted to Franchisee by Franchisor under this Agreement.

C.   In the event Franchisee is currently operating a driver training, remedial driver training or other business venture which is similar to the business conducted by Franchisor and Franchisor's franchisees, then the Franchisee hereunder shall be governed by the fees, royalty and advertising provisions set out under Attachment E, which is a part of this Agreement.

-5-

D.    The  term  **"Gross  Sales"**  shall  include  all  revenues received  from  the  sales  of  services,  goods,  and  other  revenue generated  from  sales  at,  from  or  in  conjunction  with  the  utiliza- tion,  either  singularly  or  in  combination,  of  the  System,  Marks, Territory,  Centers,  or  other  rights  granted  to  Franchisee  by Franchisor  hereunder.    The  term  **"Gross  Sales"**    excludes  federal, state,  county  and  city  sales  taxes  or  other  similar  taxes  levied upon  customers  on  the  basis  of  sales  transactions  for  services  or goods.

E.    All  weekly  payments  required  by  this  Article  II  shall  be paid  by  Thursday  of  each  week;  shall  be  based  on  the  Gross  Sales for  the  preceding  calendar  week;  and  shall  be  submitted  to Franchisor  together  with  any  reports  or  statements  required  by Franchisor.    Any  payment  or  report  not  actually  received  by Franchisor  on  or  before  such  date  shall  be  deemed  overdue.    If  any payment  is  overdue,  Franchisee  will  pay  Franchisor,  in  addition  to the  overdue  amount,  interest  on  such  amount  from  the  date  it  was due  until  paid  at  the  rate  of  **EIGHTEEN  PERCENT  (18%)**  per  year  or the  maximum  rate  permitted  by  applicable  law,  whichever  is  less. Entitlement  to  such  interest  shall  be  in  addition  to  any  other remedies  Franchisor  may  have.

F.    Franchisee  shall  pay  any  Sales  and/or  Use  Taxes  required by  law  in  conjunction  with  the  purchase  of  the  Franchise  covered  by this  Agreement.

### ARTICLE III.

### TERM AND RENEWAL

A.    This Agreement shall have an initial term of **TEN (10) YEARS** commencing on the date of its execution.

B.    Unless terminated as herein otherwise provided, Franchisee shall have the option at the expiration of the initial term of this Agreement to renew the franchise granted hereunder for a single renewal term of **TEN (10) YEARS** subject to the following conditions which must, in Franchisor's sole discretion, be met prior to renewal:

> 1.    Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than **SIX (6) MONTHS** nor more than **TWELVE (12) MONTHS** prior to the expiration of the initial term;

> 2.    Franchisee shall refurbish the Centers in a manner satisfactory to Franchisor and bring such Centers up to the then current standards of Franchisor, as well as modify, adapt and change the Franchisee's business methods, equipment and other operations to conform to Franchisor's then current standards and recommendations;

> 3.    Franchisee shall not, at the time of election to renew or at the end of the initial term, be in default of any material provision or condition of this Agreement, any amendment hereof or successor hereto, any policy, procedure, written directive, or standard of operation, or any other agreement between Franchisee and Franchisor or its subsidiaries, parent or affiliates; and Franchisee has substantially complied with all the provisions and conditions of such agreements, franchise policies, procedures or standards during the term of this Agreement;

> 4.    Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor, its subsidiaries, parent or affiliates, and Franchisee shall have timely met those obligations throughout the initial term of this Agreement;

> 5.    Franchisee shall execute a general release, in a form prescribed by and satisfactory to Franchisor, of any and all claims of whatever kind or nature against Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, agents, representatives, servants

-7-

and employees, in their corporate and individual capacities, including by way of example, and without limitation, claims arising under this Agreement and any federal, state and local laws, rules, regulations and ordinances;

6. Franchisee shall comply with Franchisor's then-current qualification and training requirements; and

7. Franchisee shall execute Franchisor's then-current form of renewal franchise agreement for the **TEN (10) YEAR** renewal term prescribed herein, which agreement shall supercede this Agreement in all other respects, the provisions and conditions of which may differ from the provisions and conditions of this Agreement. Under the then-current form of renewal franchise agreement, Franchisee shall pay, in lieu of a franchise fee, a renewal fee equal to **Ninety-five percent (95%)** of the original initial franchise fee set out in Article II.A. hereunder for each Center and shall pay such royalty, advertising and related franchise fees then being charged by Franchisor, which may be higher than those contained in this Agreement.

## ARTICLE IV.

### DUTIES OF FRANCHISOR

A.   Franchisor will upon Franchisee's request provide editing and creative comments and recommendations to Franchisee for incorporation into the Franchisee's approved teaching curriculum utilized in Franchisee's Centers.

B.   At the request of Franchisee, the on-site consultation and advice of a Franchisor employee or consultant for not more than two (2) full business days during the period commencing two (2) weeks before opening the first Center through the first three (3) months of operation of the first Center. Franchisee will pay for the reasonable transportation, hotel and food expenses of the Franchisor's employee or consultant.

C.   Periodic advice and consultation in connection with the operation of the Center, which advice may be provided at Franchisor's election in the Operations Manual and supplements thereto, in bulletins or other written materials, or by telephonic or personal consultations at the offices of Franchisor or at the Franchisee's Centers.

D.   Franchisor agrees to provide to Franchisee initial training **("Training")** in the operation of a Center utilizing the Franchisor's System and Marks. Such Training program will be conducted at Franchisor's expense. Franchisor will train the Franchisee or Franchisee's designated employee or business associate **("Trainee")**. Franchisee may have only one Trainee trained at Franchisor's expense for each Center in the Franchisee's Territory. All Trainees must complete the training to Franchisor's satisfaction or repeat the training and pay for Repeat Training fee established by Franchisor. The Training period is for three (3) days or such duration as Franchisor may determine in its sole discretion, in Metropolitan Dallas, Texas, at a location specified by Franchisor. Franchisee will be responsible for Trainee's transportation, hotel, food and miscellaneous expenses while attending Training.

E.   Franchisor will provide Franchisee with advice and counsel as to the selection of Franchisee's Center location upon Franchisee's request.

F.   The Franchisor agrees to loan to the Franchisee a copy of an Operations Manual containing Franchisor's Systems, specifications, standard operating guidelines, regulations and rules prescribed from time to time by the Franchisor, as well as Policies, Procedures and other written directives relative to other

-9-

obligations of the Franchisee under the Agreement in the operation of the Centers. The Operations Manual, Policies, Procedures and other written directives is and shall remain the confidential property of Franchisor.

G. Franchisor will conduct and administer the national advertising programs and the national advertising fund provided for under Article X. of this Agreement.

H. As applicable, generally recommend from time to time, merchandising, promotion, and advertising techniques to Franchisee.

I. When deemed appropriate by Franchisor, communicate new services, new training and teaching methods as well as new methods and techniques of operating Centers.

## ARTICLE V.

## DUTIES OF FRANCHISEE

A.    Franchisee shall be solely responsible for securing and maintaining all licenses, permits, certificates and securing the services of instructors (licensed if required by state, local or federal laws, rules or regulations) which instructors further meet the Franchisor's qualifications as instructors and comedians from time to time as specified in the Operations Manual.  Franchisee is solely responsible for securing a curriculum for teaching and training customers which is approved for use in the Franchisee's Territory by the appropriate authorities.  Franchisee may own, license from a third party or from Franchisor, if available from Franchisor, a curriculum in Franchisee's Territory which is approved by Franchisor.  Franchisee will comply with all federal, state and local laws, rules or regulations, judicial rules or orders applicable to the Operation of the franchise business and Centers.  Franchisee will comply with all of the requirements of the governing bodies to assure that the customers who successfully complete the driver training course conducted by the Franchisee receive all of the benefits available to persons in the jurisdiction that complete similar driver training courses from other providers in the jurisdiction.

B.    Franchisee understands, acknowledges and agrees that every detail of the System is important to Franchisor, other franchisees and the Franchisee in order to provide quality services by all Franchisees, and to maintain, add to and protect Franchisor's reputation and good will.  Franchisee therefore, shall comply with all requirements set forth in this Agreement and in the Operations Manual, Policies, Procedures and other written directives of Franchisor.

C.    In all dealings with Franchisor, with Franchisee's customers and suppliers, and with the public, Franchisee shall observe the highest standards of honesty, integrity, fair dealing and ethical conduct.

D.    Franchisee shall procure and maintain in full force and effect an insurance policy or policies protecting Franchisor and Franchisee and their officers and employees against any loss, liability or expense whatsoever from personal injury, death, property damage otherwise, arising or occurring upon or in connection with the operation of the Center and/or utilization of the System, whether the same occurs or the cause arises on or off said Center location.  Franchisor shall be named an additional insured in such policy or policies (Workmen's Compensation and Disability excepted).  Such policy or policies shall be written by

-11-

insurance companies satisfactory to Franchisor and shall include the following:

| Kind of Insurance | Limits of Liability |
|---|---|
| Workmen's Compensation and Disability | Statutory |
| Public liability including liability and bodily injury insurance | $300,000 each person<br>$500,000 each accident |
| Property Damage | $100,000 each accident |

The insurance afforded by the general liability policy shall not be limited in any way by reason of insurance maintained by Franchisor. Upon execution of this Agreement, certificates of insurance showing compliance with the foregoing requirements shall be furnished by Franchisee to Franchisor for approval. Certificates shall state that the policy or policies will not be cancelled or altered without at least thirty (30) days prior written notice to Franchisor. In addition, Franchisee shall insure the Center and all equipment, furnishings, fixtures and inventory therein under standard fire and extended coverage insurance policies in amounts and on terms then in effect for similar businesses.

E. Franchisee understands and agrees that Franchisee is required to use Franchisee's best efforts to establish and grow the business conducted under the System in Franchisee's Territory and to meet the Center Development Schedule set out in Attachment A.

F. Franchisee acknowledges that the operation of the Centers in accordance with the System is important to the Franchisee, the Franchisor and other franchisees in order to maintain, grow and increase the market recognition and demand for the driver training and teaching services offered by the Franchisee, the Franchisor and other franchisees. To that end, Franchisee will operate to the standards set out by the Franchisor from time to time in the Operations Manual.

G. Franchisee shall require all advertising, sales and promotional materials, including, without limitation, all printed advertising of every kind and nature, business stationery, cards, forms, envelopes, novelty items, and other items used in the conduct of the business, as designated by Franchisor to bear the Proprietary Marks in the form, color, location and manner prescribed by Franchisor.

# ARTICLE VI.

## FRANCHISEE ORGANIZATION AND GUARANTY

A.    The term Franchisee as used herein applies to a sole proprietorship, a corporation or other business association and the shareholders and members thereof.    Unless otherwise agreed to in writing by Franchisor, if more than one individual is to own any interest in the Franchise, the Franchisee must be a corporation. Each individual who has any equity, financial participation or other interest in the Franchise or in Franchisee (if Franchisee is a corporation or other business association) shall be named on Attachment B hereto, and shall execute the signature page hereto and agrees to be personally and individually, jointly and severally, liable to Franchisor for all obligations and liabilities of Franchisee to Franchisor and its affiliated companies unless otherwise agreed to in writing by Franchisor. Each individual must complete Franchisor's franchise application and be approved through Franchisor's standard franchisee selection process, including satisfactory demonstration to Franchisor that the individual meets the financial, character, managerial, equity ownership, business qualifications and the qualifications to own, license or otherwise be approved for use of a curriculum as required by the governing body in the Territory set out in Article I.A. hereunder.

B.    If Franchisee is some other business association, Franchisee shall provide Franchisor prior to the closing, with a copy of the written agreement between the members of the association and such other documents or information as may be necessary or appropriate in the opinion of Franchisor.

C.    If the Franchisee is a corporation or other entity which issues capital stock, the corporation must agree not to engage in any business activity other than that which is directly related to the operation of the Center or such other Franchisor franchise operations as shall be approved in writing by Franchisor.    Each stock certificate of the corporation shall contain the following legend:

> "The transfer of this stock is subject to the terms and conditions of a Franchise Agreement with RTKB, Inc. Reference is made to such Franchise Agreement and the restrictive provisions of the Articles of Incorporation and By-Laws of this Corporation."

-13-

The Articles of Incorporation and By-Laws of the Corporation shall contain a provision reflecting a limitation on the number of shareholders to five (5) persons; and restricting the issuance, encumbrance, assignment and transfer of shares of the corporation without Franchisor's prior written approval.

The corporation shall provide Franchisor prior to execution of the Agreement, with copies of its Articles of Incorporation, By-Laws, stock certificates and other documents or information as may be necessary or appropriate, in the opinion of Franchisor.

## ARTICLE VII.

## RIGHTS AND USE OF MARKS

A.   Franchisor hereby licenses Franchisee to use the Marks during the term of this Agreement for the conduct of business and operating Centers within the Franchisee's Territory and under the terms of this Agreement and as set out in the then-current Operations Manual.

B.   Franchisor specifically reserves the absolute right to and Franchisee acknowledges and agrees that Franchisor shall have the absolute right to substitute, add, delete from or change the Marks for use by the Franchisee to identify the System, Centers, services and goods and to conduct business hereunder or to restrict the use of the Marks as Franchisor in Franchisor's sole discretion and business judgment may determine from time to time.

C.   Franchisee acknowledges the validity of Franchisor's service marks, trademarks, logos, slogans and copyrights (hereinafter Marks), and that the same are the property of the Franchisor. The Franchisee agrees it shall not in any way take any action which would result in Franchisee infringing upon, doing harm to or contest the rights of the Franchisor in the Marks or in any other marks or names which are licensed hereunder.

D.   Franchisee agrees that Franchisee, its principals, officers, and employees shall have the right to use Franchisor's Marks only as specified by Franchisor and further agrees that:

1.   Franchisee shall use the Marks only in the operation of the Center utilizing the System, or for promoting the System.  Franchisee agrees to cease use of the Marks immediately upon the termination or expiration of this Agreement.

2.   Franchisee shall use only the Marks designated by Franchisor, and shall only use the Marks in the manner authorized and permitted by Franchisor.  Any use of the Marks in an unauthorized manner will constitute an event of default under this Agreement and an infringement of Franchisor's rights.

3.   The Franchisee recognizes that the use by Franchisee or its authorized agents of the Marks, or any other mark or name that incorporates a mark licensed by Franchisor inures to the benefit of the Franchisor and that any good will arising from such use by the Franchisee shall revert to Franchisor should this Agreement be terminated for any reason.

-15-

4.    Upon the infringement of, or challenge to, the Franchisee's use of any Mark or other name or mark of the Franchisor, the Franchisee shall immediately notify Franchisor, and Franchisor will have sole discretion to take such action as it deems appropriate.  If it becomes advisable at any time, in the sole discretion of Franchisor, to  modify or discontinue use of any Mark or other name or mark and/or use one or more additional or substitute names or marks, Franchisor reserves the right to substitute different Marks or other names or marks for use in identifying the Center and System if the Marks no longer can be used or such use is restricted, or if Franchisor, in its business judgment, determines that substitution of different Marks will be beneficial to the System.

5.    The Franchisee shall not contest Franchisor's ownership, title, right or interest in the Marks and other names or marks, or the System or any intellectual property right or contest Franchisor's sole right to register, patent, copyright, and use or license others to use the Marks or other names and marks, System, or other intellectual property rights.

## ARTICLE VIII.

### <u>CONFIDENTIAL INFORMATION, OPERATIONS MANUAL AND COMPETITION RESTRICTION</u>

A.   Franchisee acknowledges that it would be an unfair method of competition to use any portion of the System, proprietary and confidential information which has been provided to Franchisee, its employees, owners and agents.  During the term of this Agreement, Franchisee agrees not to be involved directly or indirectly in any business, investment or other commercial activity which is competitive with the business being conducted as the franchise business hereunder.

B.   In order to protect the reputation and good will of Franchisor and to maintain the high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Operations Manuals, other written directives which Franchisor may issue to Franchisee from time to time, whether or not such directives are made part of the Operations Manuals, and any other manuals created or approved for use in conducting business or the operation of the Centers.

C.   Franchisee and all other employees, officers and owners, shall at all times treat the Operation Manuals, any other manuals created for or approved for use by Francisee, and the information contained therein, as confidential, and shall maintain such information as secret and confidential.  Franchisee and all other employees, officers and owners shall not at any time copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person, without the prior written consent of Franchisor.

D.   The Operations Manuals, written directives, other manuals and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor shall at all times be kept in a secure place by Franchisee and shall be returned to Franchisor immediately upon request or upon termination or expiration of this Agreement.

E.   Franchisor may from time to time revise the contents of the Manuals and the contents of any other manuals created or approved for use by Franchisor, Franchisee expressly agrees to comply with each new or changed standard.

F.   Franchisee shall at all times insure that its copies of the Operations Manuals are kept current and up to date; and, in the event of any dispute as to the contents of the Operations Manuals, the terms of the master copy of the Operations Manuals maintained by Franchisor at Franchisor's headquarters shall be controlling.